UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------- X
  TEXAS CHICKEN & BURGERS, LLC,

                              Plaintiff,

                                                        **REPORT AND**
                                                        **RECOMMENDATION**
                    -against-                            17 CV 976 (ERK) (CLP)

  NYQ  PROPERTY,  LLC,  d/b/a  KENNEDY
  CHICKEN PIZZA & KABAB,

                              Defendant.
---------------------------------------------------------- X
**POLLAK**, Chief United States Magistrate Judge:

       On February 21, 2017, plaintiff Texas Chicken & Burgers ("Texas Chicken") sought

injunctive relief and damages against defendant NYQ Property, LLC, d/b/a Kennedy Chicken

Pizza & Kabab ("Kennedy Chicken") for willful infringement of the Lanham Act, 15 U.S.C. §

1125(a), unfair business practices under the New York General Business Law, Sections 349 and

350, and unfair competition under New York common law.  (Compl.[1]).  Plaintiff claims that

defendant utilized "confusingly similar" décor that infringed upon plaintiff's intellectual property

in violation of the above law.  (Id. ¶ 5).

       After defendant filed its answer, the defendant moved to dismiss all claims on July 24,

2017.  In a Report and Recommendation, the undersigned recommended that the court dismiss

the Complaint but allow the plaintiff leave to amend.  The Honorable Edward R. Korman

adopted the Report and Recommendation in its entirety.  Plaintiff filed an amended complaint on

April 26, 2018.  Defendant filed another motion to dismiss in response.  On October 31, 2018,

the undersigned recommended that the court grant defendant's motion to dismiss as to plaintiff's

---
[1] Citations to "Compl." refer to the initial Complaint filed on February 21, 2017, ECF No. 1.

General Business Law claims but otherwise deny the defendant's motion.  That Report and Recommendation was adopted in its entirety on November 20, 2018.

Currently pending before this Court is the question of whether a settlement agreement – prepared by plaintiff's counsel, signed by the defendant, but unsigned by the plaintiff – is a binding, enforceable settlement agreement.

## BACKGROUND

A.  The Parties' Arguments

On December 2, 2019, the Court held a status conference in this matter, entering an indication on the docket sheet that "the parties came to an agreement regarding the settlement of this case."  (See Minute Entry, dated December 2, 2019, ECF No. 50).  The parties were Ordered to file a stipulation of dismissal by January 6, 2020.  (Id.)  However, on January 6, 2020, plaintiff informed the Court that the parties were unable to settle and would need to proceed with the case.  (Pl.'s 1/6/2020 Ltr. at 1, ECF No. 51).

At the January 16, 2020 conference following that status report, the co-owner of defendant Kennedy Chicken, Mohammad Merdil, informed the Court that he believed the settlement had been finalized; he alerted the Court to the fact that plaintiff had sent him the settlement paperwork, which he had signed, notarized, and returned to plaintiff's counsel.  (See Minute Entry, dated January 16, 2020; see also December Settlement Agreement, ECF No. 64-5).  As such, he believed the settlement to be enforceable.

Plaintiff argued, however, that the settlement agreement that Mr. Merdil signed was a "walk-away" settlement that was contingent on another deal between the principals of the parties in this case and that Mr. Merdil had failed to perform his part of the bargain under that deal.  For this reason, plaintiff refused to endorse the December Settlement Agreement provided by

plaintiff's counsel to defendant.  Accordingly, the Court Ordered a hearing on the issue of whether there was an enforceable settlement reached between the parties.  (See Scheduling Order, dated January 16, 2020, ECF No. 53).

The hearing on the settlement's enforceability took place before the undersigned on July 28, 2020.  At the July 28, 2020 hearing, plaintiff presented three witnesses:  1) Abdul Nasary, a member of New York Poultry Co., who supplied poultry to both Texas Burger and Kennedy Chicken (Tr. at 14[2]); 2) Atiqullah Sadiqi, co-owner of Texas Chicken (id. at 24); and 3) Waheed Khosdal, another co-owner of Texas Chicken.  (Id. at 37).  Defendant presented the testimony of Mr. Merdil, co-owner of Kennedy Chicken.  (Id. at 64).

Following the hearing, the Court requested briefing on the issue.  In a letter brief filed on August 25, 2020, plaintiff's counsel represented that plaintiff initially asked counsel to draft a co-existence and settlement agreement for the parties in October 2019.  (Pl.'s 8/25/2020 Ltr. at 2, ECF No. 64).  At that time, defendant's counsel had moved for leave to withdraw as counsel for defendant and so the plaintiff was going to deliver the agreement directly to the defendant, rather than to defendant's counsel.  (Id.)  However, unbeknownst to plaintiff's counsel, the parties had been engaged in discussions through Abdul Nasary[3] with the intent to have defendant's principal purchase one of the stores owned by plaintiff's principals.  (Id. at 2-3; see also Tr. at 16).  According to plaintiff's counsel, plaintiff's owners had "agreed that [d]efendant would buy the Store for $40,000, pending approval from the landlord to transfer the lease for the Store."  (Pl.'s 8/25/2020 Ltr. at 3; Tr. at 16).  Counsel represented in his letter brief that, according to his

---

[2] Citations to "Tr." refer to the transcript of proceedings held before this Court on July 28, 2020.

[3] The parties could not agree on who approached whom first with regard to the purchase of the Hillside store.

clients, defendant allegedly suggested settling this case as a part of that agreement.  (Pl.'s 8/25/2020 Ltr. at 3; Tr. at 28).  Defendant, on the other hand, argued that the sale of the store was ancillary and completely separate from the Settlement Agreement at issue in this litigation. According to the defense, there "was a clear meeting of the minds" with respect to the Settlement Agreement insofar as it was drafted by plaintiff's counsel; plaintiff requested defendant's signature numerous times; and defendant signed the Agreement.   (Tr. at 6).

       B.  Evidence Presented at the Hearing

          1.  The Store Acquisition

At the hearing, Abdul Nasary testified that Mr. Merdil contacted him in September 2019 and told him that "business is slow" and that he was interested in buying the Kennedy Chicken store located on Hillsdale Avenue (the "Hillside store") that belonged to Mr. Fahim [Fhotaki] and Mr. Atiqullah [Sadiqi], the owners of Texas Chicken. (Tr. at 15).  Nasary testified that Merdil suggested the price of $40,000 for the store and Nasary thereafter contacted Mr. Sadiqi, who agreed to the price.  (Id. at 16).  Merdil disagreed as to who reached out first regarding the sale of the store, testifying that in June or July 2019, when he was in Afghanistan, plaintiff's principals, through Nasary, reached out to him about the purchase of the store.  (Id. at 67, 72). He stated that when he returned from Afghanistan, he contacted Nasary and agreed to the terms. (Id.)  Nasary testified that "a couple of weeks" after the initial conversation with Merdil, Merdil brought him $10,000 as a deposit on the purchase of the store.  (Id. at 16).  Nasary told Merdil that if there was a problem with the lease, the owners of the Hillside store would give Merdil back his money.  (Id.)  When asked on cross-examination whether the negotiations for the store continued through December, Nasary insisted that the negotiations for the sale of the store were

"done in September."  (Id. at 20-21).[4]

Atiqullah Sadiqi, a co-owner of plaintiff Texas Chicken, testified that he was approached by Nasary, who said Merdil was interested in buying the Hillside store.  (Id. at 25).  Nasary and Sadiqi discussed the $40,000 and Sadiqi agreed to the sale.  (Id. at 25-26).  Sadiqi testified that he did not actually discuss the sale directly with Mr. Merdil until the "end of October" (id. at 26), seeming to contradict Nasary's testimony that the sale of the store was "done in September."  (Id. at 20-21).  Sadiqi testified that when he did speak directly with Merdil, Merdil questioned him about the rent and other "small things."  (Id. at 26).  When asked if they discussed the litigation at that time, Sadiqi said "No."  (Id.)

According to plaintiff's counsel, on December 2, 2019, defendant presented plaintiff with $40,000 in two certified checks as payment for the store.  (Pl.'s 8/25/2020 Ltr. at 3).  The documentary evidence shows that there were two certified checks obtained from Santander Bank, dated December 2, 2019.  (ECF No. 64-4).  One was for $10,000; the other for $30,000.[5]  (Id.)  Nasary testified that Merdil brought him a check for $30,000 and a check for $10,000 and told Nasary:  "the check is for the store."  (Id. at 18).  Nasary then delivered the checks to Fahim

---

[4] Mr. Nasary's testimony appears to have been colored by the fact that Merdil owed him $10,967.  (Id. at 20).  He testified that he made several deliveries of poultry to Merdil, but that Merdil failed to pay Nasary for the fourth delivery.  (Id. at 17).  According to Nasary, "a couple of days after he bring $10,000 and then disappear;" Merdil "don't want to pay my money. He owed me [Nasary] $10,967."  (Id. at 20).

[5] The testimony about the delivery of the checks was inconsistent.  Since December 2, 2019 was a Monday, it is unclear how Nasary could have delivered the checks on a Friday and Saturday, unless the delivery of the checks occurred later in the week of December 2.  The previous Friday and Saturday would have been in November, and since the checks were both dated December 2, they could not have been delivered in November.  Moreover, both checks bear the same date – Monday, December 2, 2019.  An additional inconsistency became obvious at the hearing: it is unclear what happened to the first $10,000 deposit about which Mr. Nasary testified.  If Nasary is to be believed, Merdil provided him with checks totaling $50,000: one for $10,000 delivered in September, and two checks delivered in December – one for $10,000 and one for $40,000.  (Tr. at 16).

Fhotaki, another principal of plaintiff, explaining that on Friday, Nasary gave Fhotaki the check for $30,000 and then on Saturday, he gave him the check for $10,000. (Id. at 19). From this testimony, it is clear that the checks were related to the purchase of the store and not the litigation; indeed, Nasary testified that the checks were related to "the deal about that store." (Tr. at 18).

According to Sadiqi, they transferred the store to Merdil the last week in November. (Id. at 29). He testified that the transfer of the store happened after Merdil dropped off the $10,000 with Nasary. (Id. at 30). Sadiqi explained that the only thing left was to transfer the lease to Merdil, but then Merdil cancelled the checks. (Id. at 30-31). Sadiqi's testimony about the transfer of the store taking place in November after the receipt of the check also conflicts with the date on the two checks – December 2, 2019.

Merdil, defendant's co-owner, did not deny that the parties had discussed the purchase of the Hillside store. He explained that he cancelled the checks when he learned that the information plaintiff's principals provided relating to the rent and the income of the business was not accurate. (Tr. at 69). He had been told that the rent was $1,600 or $1,800 when the rent was actually $2,800. (Id. at 68). He also claimed that upon taking possession of the store, he learned that the business was earning a lot less than had been represented to him. (Id. at 69). It is for that reason that he cancelled payment on the checks. (Id. at 82).

2. Settlement Negotiations

It is undisputed that at some point while the principals were discussing the sale of the Hillside store, there were discussions about resolving the instant litigation. The testimony provided by the plaintiff's witnesses about when these discussions occurred and their timing vis a vis the store sale was unclear and often contradictory. Nasary, for example, seemed to be

unaware of the litigation at issue here; in response to a question on cross-examination as to whether the litigation was discussed during the negotiations, Nasary testified: "They make the deal about that store." (Tr. at 18).

Plaintiff's third witness, Waheed Khosdal, testified that he is a part owner of Texas Chicken and that he worked with the legal team on this litigation. (Id. at 37). According to Khosdal, his brother, Sadiqi, approached him in early September and indicated that he had made a deal with Merdil to sell the Hillside store. (Id.) Khosdal testified that "a couple of days later," Sadiqi told him that Merdil wanted to settle the case; he "doesn't have any money," is "having problems," and is buying the store. (Id. at 39). Khosdal then testified that, on September 19, he emailed plaintiff's lawyer to have him draw up the settlement agreement, which he gave to Merdil. (Id.)

The testimony that the plaintiff agreed to "let the case go" [6] in light of the September discussions of the store sale, however, is not supported by the initial settlement agreement drafted by plaintiff's counsel and provided to defendant. It is undisputed that, at plaintiff's request, plaintiff's counsel drafted an agreement to settle this litigation. (Pl.'s Ex. A, ECF No. 64-1, herein "the October Agreement"). The October Agreement contained a provision that

---

[6] According to Sadiqi, when he discussed the litigation with Merdil in October, Merdil asked him to "let the case go," referring to the litigation at issue here, so Sadiqi discussed it with his partners, Waheed Khosdal and Fahim Fhotaki, and they agreed, "since he's buying the store, let's close this case too." (Tr. at 28). Sadiqi's testimony that he only discussed the litigation in October contradicts Khosdal's testimony that resolution of the litigation in connection with the sale of the store took place in September. (Id. at 20-21, 29). Indeed, later, during his testimony, Sadiqi changed his statement again, testifying that he discussed things relating to the litigation with Merdil "after he gave me the check . . . That's when, after he gave me the checks" in the "beginning of December sometime – that's when . . . we discussed the case." (Id. at 27-28). Given that Sadiqi claimed to have negotiated both the settlement and the sale of the store with Merdil, his inability to recall whether the discussions about the settlement took place in September, or October, or after the delivery of the checks in December, raises questions as to his credibility with respect to claim that the settlement was contingent on the sale of the store.

required defendant to cease all use of its current colors and change its décor (id.; Tr. at 42), the result explicitly contemplated by the plaintiff's Complaint.  (Compl. ¶¶ 17, 2b (seeking to enjoin defendant from using infringing décor)).  It contained no mention of the proposed sale of the Hillside store.  (Pl.'s Ex. A).

On October 18, 2019, prior to receiving the October Agreement, defendant's principal Merdil, proceeding *pro se* and not through his counsel, wrote a letter to the Court, stating that the parties had reached an out-of-court settlement of the instant lawsuit.  (Merdil 10/18/20219 Ltr., ECF No. 47; see also Pl.'s 8/25/2020 Ltr. at 3).  At this point, the Court had not yet granted defendant's counsel's motion to withdraw and ordered the parties and their respective counsel to appear for a status conference on December 2, 2019.  (Scheduling Order, dated 11/14/2020, ECF No. 48).  Thereafter, according to plaintiff's counsel, before the scheduled conference could occur, Merdil visited the plaintiff on November 19, 2019, at which time plaintiff gave Merdil the counsel-drafted October Settlement Agreement.  (Pl.'s 8/25/2020 Ltr. at 3).  Counsel was then informed by his client that Merdil would review the agreement and sign it if he agreed to the terms.  (Id.)  This again appears to be inconsistent with testimony at the hearing:  Khosdal testified that Merdil told him in October that he did not have any money to make the changes to Kennedy Chicken that were contemplated by the October Agreement, and he asked to have that particular paragraph removed from the Agreement.  (Id. at 44).  Khosdal testified that he then emailed plaintiff's lawyer and asked him to remove the paragraph requiring defendant to change its décor.  (Id. at 43-47).  Khosdal did not, however, inform counsel of the proposed store transaction.  (Pl.'s 8/25/2020 Ltr. at 3).

On December 2, 2019, the parties appeared before the Court.  (See Minute Entry, dated 12/2/2019).  Following the conference, on December 4, 2019, Khosdal testified that he sent a

text to Merdil telling him that they had emailed him the new settlement agreement and asking

him to take a look at it (the "December Agreement").  (Tr. at 47; ECF No. 64-5).  Although the

December Agreement eliminated the requirement that Merdil affirmatively change the décor of

defendant, the new agreement contained a provision that defendant would not "utilize any TCB

IP (including its colors and décor)."  (Settlement Agreement[7] ¶ 2).  In response to Khosdal's text,

Merdil responded by saying that he would check his email and call Khosdal back.  (Tr. at 47;

ECF No. 64-3).  On December 10, 2019, defendant signed and notarized the December

Agreement and sent it to plaintiff's counsel.  (Tr. at 48; see also Settlement Agreement).

However, on December 11, 2019, plaintiff Khosdal informed defendant that they needed to

speak before signing the agreement.  (Tr. at 48-49).

Although Khosdal testified that the only reason they settled the case was because Merdil

had agreed to buy the other store (id.), he conceded on cross-examination that there was nothing

in either the October or December Agreements about the sale of the store, and that Section 4.10

of the December Agreement explicitly stated that there were no other oral agreements beyond

what was in the settlement agreement itself.  (Id. at 54).  The witness admitted that there was

only a "good faith verbal agreement" to purchase the store.  (Id. at 58).  He attempted to explain

the absence of any mention of the side deal to sell the Hillside store by noting that Texas

Chicken, the actual plaintiff in this litigation, had no relationship to the Hillside store, apart from

the fact that the stores shared common co-owners.  (Id. at 59).  "It was never a part of that from

the beginning."  (Id. at 60).

---

[7] Citations to the "Settlement Agreement" refer to the December Settlement Agreement, drafted by the plaintiff and signed by the defendant, attached to plaintiff's 8/25/2020 Ltr., ECF No. 64-5.

In the submission by defendant's counsel, defendant insists that the sale of the store was "an ancillary and unrelated deal" that was not mentioned in the Agreement drafted by plaintiff's counsel and given to defendant to sign. (Def.'s 8/25/2020 Ltr. at 1, ECF No. 63; see also Tr. at 6). In asserting that the sale of the Hillside store was "unrelated to this case," defendant points to language in the Agreement stating that this Agreement is the "entire understanding and agreement between the parties." (Id.; see also Tr. at 54). Defendant notes that not only did plaintiff provide this December Settlement Agreement to defendant on December 2, 2019, indicating that it could be returned to plaintiff or plaintiff's counsel, but plaintiff then followed up with defendant on December 9, 2019, urging defendant to sign it, telling him that if defendant was "okay with the document, you can just notarize it and drop it off in the hillside ave office [sic]." (Id.) Additionally, defendant notes that plaintiff also texted defendant to encourage him to review the document without "wast[ing] time." (Id.) In defendant's view, defendant's execution, notarization, and return of the Agreement "provides for an end to this lawsuit, including dismissal of this case with prejudice." (Id.)

## DISCUSSION

### I.  Legal Standards

As an initial matter, the Court notes that the Second Circuit "has not resolved the question of whether a district court should apply federal or state law to decide a motion to enforce a settlement" in federal question cases. Renaissance Search Partners v. Renaissance Ltd., No. 12 CV 5638, 2013 WL 6839039, at *3 (S.D.N.Y. Oct. 15, 2013), report and recommendation adopted in relevant part, 2013 WL 6840109 (S.D.N.Y. Dec. 13, 2013). "The majority of district courts have applied only federal common law in federal question cases when a motion is filed to enforce an oral settlement agreement." Id. "There is, however, 'no material difference' between New York state law and federal common law on this point." Sulaymu-Bey

v. City of New York, No. 17 CV 3563, 2020 WL 6709548, at *2 (E.D.N.Y. Oct. 13, 2020),

report and recommendation adopted, 2020 WL 6707486 (E.D.N.Y. Nov. 16, 2020)  (citing

Ciaramella v. Reader's Digest Ass'n, 131 F.3d 320, 322 (2d Cir. 1997)).

 In Winston v. Mediafare Entertainment Corp., 777 F.2d 78, 80 (2d Cir. 1985), the Second

Circuit "articulated four factors to guide the inquiry regarding whether parties intended to be

bound by a settlement agreement in the absence of a document executed by both sides."

Ciaramella v. Reader's Dig. Ass'n, Inc., 131 F.3d 320, 323 (2d Cir. 1997) (citations omitted).

Under the Winston test, courts consider "(1) whether there has been an express reservation of the

right not to be bound in the absence of a signed writing; (2) whether there has been partial

performance of the contract; (3) whether all of the terms of the alleged contract have been agreed

upon; and (4) whether the agreement at issue is the type of contract that is usually committed to

writing.  No single factor is decisive, but each provides significant guidance."  Id.  "We therefore

evaluate each of the Winston factors separately . . . and then assess them together."  Shinhan

Bank v. Lehman Bros. Holdings Inc., 739 F. App'x 55, 57 (2d Cir. 2018).

 Additionally, the Second Circuit has repeatedly held that under New York contract law,

parties "may enter into a binding contract orally, and the intention to commit an agreement to

writing standing alone will not prevent contract formation."  Winston v. Mediafare

Entertainment Corp., 777 F.2d at 80.  "In such a case, the agreement is binding even if a party

has a change of heart between the time of the oral agreement to the terms and the time those

terms are reduced to writing."  Gregory v. Hansen, No. 06 CV 1726, 2007 WL 9813141, at *2

(S.D.N.Y. Sept. 19, 2007) (citing Winston v. Mediafare Entertainment Corp., 777 F.2d at 80).

Indeed, courts have repeatedly noted that settlement agreements are strongly favored in New

York and "may not be cast aside merely because of an afterthought or change of heart."  Id.

(citing McNamara v. Tourneau, 464 F. Supp. 2d 232, 239 (2006); Willgerodt v. Hohri, 953 F. Supp. 557, 560 (S.D.N.Y. 1997)).

It is equally well settled that "[a] contract need not be signed to be enforceable." Flores v. Lower E. Side Serv. Ctr., Inc., 4 N.Y.3d 363, 368, 828 N.E.2d 593, 795 N.Y.S.2d 491 (N.Y. 2005). However, "if the parties to an agreement do not intend it to be binding upon them until it is reduced to writing and signed by both of them, they are not bound and may not be held liable until it has been written out and signed." Scheck v. Francis, 26 N.Y.2d 466, 469-470, 260 N.E.2d 493, 311 N.Y.S.2d 841 (N.Y. 1970). In order to determine whether a party entered into a contractual agreement, a court looks to "the objective manifestations of the intent of the parties as gathered by their expressed words and deeds." Flores v. Lower E. Side Serv. Ctr., Inc., 4 N.Y.3d at 368 (internal quotation and citation omitted). "[W]hen a party gives forthright, reasonable signals that it means to be bound only by a written agreement," that intent is honored. R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 75 (2d Cir. 1984).

II. Analysis

1. Partial Performance

Among the four Winston factors that the Court should consider in determining whether the parties intended to be bound by an agreement is whether there has been partial performance of the agreement. Winston v. Mediafare Entertainment Corp., 777 F.2d at 80. Plaintiff argues that in this case, there has been no performance on the Settlement Agreement. (Pl.'s 8/25/2020 Ltr. at 7). Defendant contends that there has been partial performance, insofar as the parties have "drop[ped] hands" and stopped fighting as a result of the Agreement. (Def.'s 8/25/2020 Ltr. at 3). Although the parties "have not ceased to litigate" entirely, Sulaymu-Bey v. City of New York, 2020 WL 6709548, at *4, the parties have only appeared before this Court to litigate the issue discussed herein. Due to defendant's counsel's pending motion to withdraw, and the

dispute over the enforceability of the December Agreement, neither party has taken any further steps to move forward with discovery.  More importantly, since plaintiff has characterized the agreement as a "walk-away" agreement, meaning that the parties agree to go their separate ways and cease litigation, it is unclear what more plaintiff expects defendant to do to perform under the Settlement Agreement.  Thus, the Court finds this factor is neutral as to the enforcement of the Settlement Agreement.

   2. Agreement to Material Terms

   The next Winston factor looks to whether the parties agreed on all material terms.  See, e.g., Massie v. Metro. Museum of Art, 651 F. Supp. 2d at 96.  This factor weighs in favor of enforcement only where "there [i]s 'literally nothing left to negotiate.'"  Sulaymu-Bey v. City of New York, 2020 WL 6709548, at *4 (citing Winston v. Mediafare Ent. Corp., 777 F.2d at 82).  Plaintiff does not believe this factor weighs strongly for either side.  (See Pl.'s 8/25/2020 Ltr. at 7).  The Court disagrees.

   Here, the December Settlement Agreement contains all the material terms; there is nothing in the Settlement Agreement that has been left open for negotiation.  Indeed, plaintiff presented the Agreement, drafted according to terms dictated by plaintiff to its attorney, and urged the defendant to sign the Agreement as is.  From plaintiff's conduct and communications with defendant, it was clear plaintiff did not contemplate that there would be any further negotiation as to the terms of the Agreement.  Indeed, there was no review of the Agreement by defendant's counsel, who was not participating in the negotiations or the drafting of the actual Agreement, and no indication from defendant that he was not in full agreement with the terms of the Settlement Agreement as provided by plaintiff.  Although the plaintiff now argues that the sale of the store was a condition precedent to the Settlement Agreement, that alleged agreement

to sell the store was never a part of the written Settlement Agreement.  (See Tr. at 54).  Not only

is there no reference to this side agreement to sell the Hillside store in the December Agreement,

it is clear from the witnesses' testimony that there was never any intent to include that side

agreement in the settlement agreement.  Indeed, the merger clause in the Agreement expressly

states that the writing is "the entire understanding and agreement between the Parties," and "no

other . . . undertakings, or other prior or contemporaneous agreements, oral or written, which are

not specifically incorporated herein, shall be deemed in any way to exist or bind any of the

Parties."  (Settlement Agreement ¶ 4.10).  This language expressly precludes consideration of

any other prior agreements, such as the sale of the store, because it was not "specifically

incorporated herein," and thus not binding on the parties.  (Id.)

     As such, the Court finds that the parties had agreed to all material terms relating to the

settlement, and thus, this factor weighs in favor of enforcement.

    3. Type of Contract Typically Memorialized in Writing

    Another Winston factor to consider is whether the December Settlement Agreement is the

kind of contract that is typically memorialized in writing.  A settlement agreement is typically

memorialized in writing.  Ciaramella v. Reader's Dig. Ass'n, Inc., 131 F.3d at 326 (holding that

"[s]ettlements of any claim are generally required to be in writing or, at a minimum, made on the

record in open court").  As noted infra, there is no question that both parties intended to have the

settlement memorialized in writing.  As addressed below, the only open issue is whether the

parties intended a requirement that the written agreement be fully executed before the agreement

could be enforced.

4. <u>Express Reservations</u>

The most pivotal <u>Winston</u> factor in this case is whether there was an express reservation not to be bound in the absence of a written, signed agreement.  This factor "concerns whether the parties intended to consent to a binding agreement without a writing."  <u>Massie v. Metro. Museum of Art</u>, 651 F. Supp. 2d 88, 94 (S.D.N.Y. 2009).  The court must determine whether there are "indications in the [December Settlement Agreement] that the parties did not intend to bind themselves."  <u>Ciaramella v. Reader's Dig. Ass'n, Inc.</u>, 131 F.3d at 324.  "Considerable weight is accorded to such statements, as courts should avoid frustrating the clearly-expressed intentions of the parties."  <u>Massie v. Metro. Museum of Art</u>, 651 F. Supp. 2d at 94 (citing <u>R.G. Group. Inc. v. Horn & Hardart Co.</u>, 751 F.2d 69, 75 (2d Cir. 1984)).

Keeping in mind the well-established rule that any ambiguities in an agreement are construed against the drafter, <u>see, e.g.</u>, <u>Guardian Life Insurance Company of America v. Schaefer</u>, 70 N.Y.2d 888, 890, 519 N.E.2d 288, 289 (N.Y. 1987) (relying on the "rule of construction that ambiguities in contracts must be construed against the drafter"); <u>Graff v. Billet</u>, 64 N.Y.2d 899, 487 N.Y.S.2d 733 (N.Y. 1985) ("[i]f there is any doubt or uncertainty as to the meaning of the disputed language in the [] agreement, all ambiguity must be resolved against the [party] who prepared it"), the Court first analyzes the actual language of the December Agreement to determine if there was an express reservation of rights not to be bound until there was a signed written agreement.  Although this is not a case where one party imposed a form agreement on the other, in this case, the Court is mindful that the December Settlement Agreement was prepared by the plaintiff's counsel, on terms dictated by plaintiff, and presented to the defendant who was acting without the advice of an attorney, essentially *pro se*.

15

However, in this case, there is no ambiguity in the language of the Settlement Agreement whatsoever.  There is no language in the December Agreement requiring it to be fully executed before it becomes binding, as even plaintiff concedes.  (See Pl.'s 8/25/2020 Ltr. at 5).  This is in stark contrast to the express reservation clauses that have led other courts to find an intent to be bound only when the draft is signed by both parties.  See, e.g., Ciaramella v. Reader's Dig. Ass'n, Inc., 131 F.3d 320, 324 (2d Cir. 1997) (finding that the parties did not intend to be bound until the document was signed by both parties and relying on the language of the written agreement, stating that:  "This Settlement Agreement and General Release shall not become effective *until it is signed* by Mr. Ciaramella, Davis & Eisenberg, and Reader's Digest") (emphasis added).  Indeed, the only language in the December Agreement that could plausibly be read to create an intent to be bound only upon signature relates to future modifications of the terms, but not to the signing of this agreement.  (Settlement Agreement ¶ 4.14 ("Any modification of this Agreement shall be made in a written document, signed by both Parties")).

Here, without any indication in the Settlement Agreement that the parties intended to be bound only upon execution of the agreement, this factor appears to favor defendant's argument.

Although the December Agreement does *not* contain a clause that expressly reserves the right not to be bound in the absence of a signed writing, that does not end the inquiry.  Where "there is nothing in the [document] indicating that either 'party expressly reserved the right not to be bound in the absence of a writing' and formal execution," Lion-Aire Corp. v. Lion Air Installation, Inc., No. 19 CV 3554, 2020 WL 3868755, at *3 (E.D.N.Y. July 8, 2020), language in the correspondence between the parties can reveal such an intent.  Winston v. Mediafare Ent. Corp., 777 F.2d at 81.  Therefore, the Court looks to "the words and conduct of the parties" to determine if "there was an implied reservation of such a right."  Sprint Communications Co. L.P.

16

v. Jasco Trading, Inc., 5 F. Supp. 3d 323, 332 (E.D.N.Y. 2014). A determination of whether the parties have manifested an intent to be bound by provisions of a settlement agreement prior to the delivery of a written agreement requires consideration of the totality of the circumstances. International Telemeter Corp. v. Teleprompter Corp., 592 F.2d 49, 56 (2d Cir. 1979).

In this case, both the language of the Agreement and the conduct of the parties evinces a clear intent to reduce the agreed-upon settlement to writing – even if there is no evidence that they intended to reduce the settlement to a "written, signed document." Winston v. Mediafare Ent. Corp., 777 F.2d at 81. Indeed, the plaintiff undertook to have its attorney draft the actual language of the December Agreement, provided the attorney with the information relevant to the terms of the agreement reached between the parties, and transmitted the agreement to defendant for signature. Thus, the issue is whether there is any evidence to show that plaintiff expressed to defendant that it would not be bound by the settlement agreement it drafted until plaintiff actually signed the agreement. "[A]n unsigned contract may be enforceable, provided there is objective evidence establishing that the parties intended to be bound." Flores v. Lower E. Side Serv. Ctr., Inc., 4 N.Y.3d at 369. This is true "unless . . . the parties have agreed that their contract will not be binding until executed by both sides." Kowalchuk v. Stroup, 61 A.D.3d 118, 125 (App. Div. 1st Dept. 2009). Neither the communications nor the conduct of the parties suggests that plaintiff intended to be bound only upon its signature on the Settlement Agreement.

In attempting now to explain why plaintiff did not sign the December Settlement Agreement after it was signed by defendant and why the Agreement should not be enforced, plaintiff argues that it was always understood that the settlement of the lawsuit was dependent upon the successful sale of the store.[8] Plaintiff argues that text messages between the parties

---

[8] Importantly, there is a difference between evidence that suggests the plaintiff did not

suggest plaintiff did not intend to be bound by this agreement until it was signed by both parties.

Plaintiff cites one text message sent from plaintiff to defendant on December 10, 2019, in which

plaintiff states that defendant "needed to settle [his, the defendant's] differences with Atiquallah

before [he, the plaintiff] can sign the settlement." (ECF No. 64-3). The text does not further

indicate what these "differences" refer to; the text only indicates that Atiquallah was leaving

town for two weeks. (Id.) Plaintiff also cites to defendant's text message sent after he signed the

Agreement, requesting that he receive a copy of the settlement agreement. (Pl.'s 8/25/2020 Ltr.

at 6). Plaintiff would have the Court infer from this text that defendant sought a copy of the

settlement agreement once it was signed by plaintiff, although the text does not state as much.

Even assuming that is true, this text message fails to establish *plaintiff's* intent to be bound only

be a signed writing.

 Although not much was clear from the testimony provided by plaintiff's witnesses with

respect to the side deal relating to the sale of the Hillside store,[9] the undisputed evidence was

that, after sending the December Settlement Agreement to defendant, plaintiff made numerous

attempts to encourage defendant to sign this agreement, sending defendant texts and emails in

which he "implored" defendant to sign. (Def.'s 8/25/2020 Ltr. at 2; see also ECF No. 60-1 ("If

you are okay with the document, you can just notarize it and drop it off in the hillside ave

---

intend to be bound until the agreement was signed by both parties and evidence that suggests why
plaintiff did not, in fact, sign the document. As to the first, as discussed supra, there is no evidence
that plaintiff intended to be bound only upon both parties' signatures. As to the second unrelated
question, as discussed infra, the Court finds that evidence also insufficient to support plaintiff's
arguments.

 [9] Plaintiff's witnesses not only provided contradictory testimony as to the discussions
leading to the deal to sell the Hillside store and how many checks were to be exchanged or the
dates on which various discussions about the sale of the store occurred, but in a number of
instances, a witness changed his testimony about certain aspects of the deal. After due
consideration of the testimony, the Court finds it generally unpersuasive and has looked to the
actual documents provided.

office")).  Nothing in plaintiff's correspondence relating to the December Agreement suggests that there was anything else to be negotiated with respect to the terms of this agreement, nor was there any mention in this correspondence between the parties addressing the side deal to purchase the store.  Not only is there no specific reference to the need to consummate the sale of the store in the Agreement, but there is also nothing in the correspondence that indicates that there were other conditions precedent that needed to be satisfied before the Agreement became final, including plaintiff's signature on the agreement itself.

To the extent that plaintiff now argues that there was an unmet condition precedent, which caused plaintiff to withhold its signature from the Settlement Agreement, other emails and texts, exchanged between the parties, contradict plaintiff's claim that the settlement of the litigation was contingent on the sale of the store.  In November, long before the December Agreement was provided to defendant, there was a series of emails between the parties in which plaintiff's principal discussed the sale of the store.  On November 6, 2019, plaintiff's principal sent a text to Merdil stating:  "Call me if you still want to buy the store.  If you are not interested any more I will sell it to someone else."  (ECF No. 64-3).  The litigation is not mentioned at all in the text.  Subsequent texts on November 18 and 19, 2019 were exchanged discussing the store, but there was no mention of the instant litigation or a potential settlement of this litigation in any of these exchanges.  (Id.)

Even after the December Agreement had been provided to defendant, texts relating to the Hillside store transaction sent from plaintiff's principal do not reference the settlement agreement or warn defendant that there was no intention to settle unless Merdil agreed to buy the store.  Instead, plaintiff's principal warns Merdil that if he does "not respond soon I am going to cancel the lease."  (Id. (quoting text from 12/16/19); see also text from 12/20/19 stating:  "I am

assuming you don't want [the store] so I am going to send the landlord the cancellation of the lease letter and disconnect the electricity and internet on Monday").  By contrast, there is a separate strand of exchanges in which plaintiff implores defendant to sign the Settlement Agreement, but which make no reference to the sale of the store.  These emails simply urge defendant to sign the settlement papers:  "Please review the documents.  Don't waste time."  (ECF No. 64-3).  Again, there is no indication from plaintiff in any of these communications that he had no intention to sign the Settlement Agreement until the sale of the store was consummated.

Thus, based on the record before this Court, there is no evidence, either express or implied, that would indicate plaintiff's intent not to be bound by the December Agreement.  Nor is there evidence that plaintiff intended to be bound only upon the signature of both parties.  To the extent that plaintiff argues the sale of the store has any bearing on whether he intended to be bound by the unsigned Settlement Agreement, the documentary evidence contradicts that argument.

Plaintiff, however, argues that the Settlement Agreement's merger clause indicates an intention not to be bound to the agreement until it is fully executed.  (Pl.'s Ltr. at 6 (citing Ciaramella v. Readers Dig. Ass'n Inc.,[10] 131 F.3d at 324-25 (noting that merger clauses have been found to be "persuasive evidence that parties did not intend to be bound prior to the execution of a written agreement")); see also McCoy v. New York City Police Dept., No. 95 CV

---

[10] The facts in Ciaramella distinguish it from this case.  In Ciaramella, defendant drafted the settlement agreement, provided it to plaintiff's counsel who engaged in further negotiations with defendant as to its terms, and before the agreement was finalized, plaintiff replaced his counsel with new counsel who advised against signing the agreement as presented by defendant. Under those facts, where additional negotiations as to terms were ongoing, it is clear that there was no meeting of the minds as to the settlement.

4508, 1996 WL 457312, at *2 (S.D.N.Y. Aug. 14, 1996) (refusing defendants' motion to enforce a settlement agreement in a Section 1983 civil rights case where a signed copy of the settlement agreement, drafted by defendant, and containing a merger clause, had not been returned by the plaintiff despite plaintiff's assurances that the papers had been signed and mailed).

While a merger clause may evidence an intent to be bound by a written agreement, it is *not* the equivalent of a provision that the agreement is not binding until it has been so executed. Cf. Kowalchuk v. Stroup, 61 A.D.3d at 125 ("the provision in the Settlement Agreement that '[t]he Agreement is complete and binding upon its execution by all signatories' is not the equivalent of a provision that it is *not* binding *until* it has been so executed") (emphasis in original). Indeed, in this case, the presence of a merger clause is strong evidence that the plaintiff did not intend the terms of the side deal to purchase the store to be a contingency upon which the settlement of the litigation depended. The merger clause set forth in the December Agreement makes it clear that the Settlement Agreement constitutes the "entire understanding and agreement" between the parties, and that "[n]o other representations, covenants, or undertakings" or "other prior or contemporaneous, agreements oral or written" are binding on the parties.[11]

---

[11] The merger clause in its entirety provides:
"This Agreement contains the entire understanding and agreement between the Parties with respect to the matters referred to herein, and supersedes any and all other agreements, understandings, negotiations or discussions, either oral or in writing, express or implied, between the Parties to the same. No other representations, covenants, undertakings, or other prior or contemporaneous agreements, oral or written, respecting such matters, which are not specifically incorporated herein, shall be deemed in any way to exist or bind any of the Parties. This Agreement shall not be modified, amended, varied or supplemented except by a writing of subsequent or even date executed by authorized representatives of the Parties."
(Settlement Agreement ¶ 4.10).

In many ways, this case fits the classic scenario for finding a binding settlement agreement: "an offer, acceptance, consideration, mutual assent and intent to be bound." Delyanis v. Dyna-Empire, Inc., 465 F. Supp. 2d 170, 173 (E.D.N.Y. 2006). Here, an offer was made by plaintiff; it was accepted by the defendant; there was mutual consideration in that both parties agreed to walk away from the litigation, with defendant agreeing not to infringe on plaintiff's intellectual property in the future. Importantly, both parties assented to the language of the Settlement Agreement: plaintiff by specifically instructing his counsel as to the edits to be made to the earlier October Agreement and by encouraging the defendant to sign the December Agreement, and the defendant by signing, notarizing, and returning the Agreement to the plaintiff. Defendant's intent to be bound is clear from his signature; plaintiff's lack of signature does not, however, prevent the Court from finding plaintiff also intended to be bound by this Agreement as shown by its drafting and imploring defendant to sign this Settlement Agreement.[12] Under New York law, a settlement agreement may be binding when it is signed by only one party – or neither party. See Consarc Corp. v. Marine Midland Bank, N.A., 996 F.2d 568, 572 (2d Cir. 1993) ("Relevant writings creating a contract may consist of letters bearing the signature of only one party or even memoranda unsigned by either party"). Here, where plaintiff drafted the agreement and encouraged defendant to sign it, plaintiff's intent to be bound by the drafted Settlement Agreement is clear.

In the absence of any evidence suggesting that plaintiff either expressly or impliedly reserved its rights not to settle until it signed the agreement, the Court finds that this factor

---

[12] In fact, in some states, the law has made clear that "where one party drafts a contract and presents it to the offeree for signing, the contract is valid and binding upon the offeree's acceptance even if the offeror subsequently fails or refuses to sign the document." Atlantic Banana Co. v. Standard Fruit & S. S. Co., 493 F.2d 555, 559 (5th Cir. 1974).

weighs in favor of enforcing the settlement.

Thus, weighing the four factors together, and looking at a totality of the circumstances, the Court respectfully recommends that this Settlement Agreement be enforced. Although plaintiff argues that it did not intend to be bound by its unsigned agreement, the plaintiff's refusal to sign the December Settlement Agreement that he instructed his counsel to draft has all the tell-tale signs of a later change of heart on the part of the plaintiff, which courts have found do "not frustrate the agreement's enforceability." Conway v. Brooklyn Union Gas Co., 236 F. Supp. 2d 241, 251 (E.D.N.Y. 2002).

Here, the plaintiff's conduct and communications evince plaintiff's intent to be bound by the drafted Settlement Agreement.[13] Thus, the Court respectfully recommends that the court find the Settlement Agreement to be enforceable.

III. Defendant's Counsel's Request to Withdraw

In a separate motion, defendant's counsel requested to withdraw from this matter. (Def.'s 8/25/2020 Ltr. at 3). However, it is well settled in this Circuit that "a corporation [ ] cannot proceed pro se in federal court." Trustees of Empire State Carpenters Annuity, Apprenticeship, Labor-Mgmt. Cooperation, Pension & Welfare Funds v. Tri-State Acoustics Corp., No. 13 CV 05558, 2014 WL 4537481, at *5 (E.D.N.Y. Sept. 11, 2014); see also Shapiro, Bernstein & Co. v. Cont'l Record Co., 386 F.2d 426, 427 (2d Cir. 1967) (per curiam). As such, if the court does not enforce the Settlement Agreement, this Court respectfully recommends that defendant's counsel's motion to withdraw be granted, and that defendant be given 60 days to find new counsel. Defendant's counsel is Ordered to provide a copy of this Report and Recommendation to defendant and to file on the docket the contact information for defendant's principal.

---

[13] Defendant's consent is, by its signature and by its arguments before this Court, obvious.

CONCLUSION

Accordingly, the Court respectfully recommends the court find that the Settlement Agreement is enforceable.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); see also Fed. R. Civ. P. 6(a), (e) (providing the method for computing time).  Failure to file objections within the specified time waives the right to appeal the District Court's order.  See, e.g., Caidor v. Onondaga Cty., 517 F.3d 601, 604 (2d Cir. 2008) (explaining that "failure to object timely to a . . . report [and recommendation] operates as a waiver of any further judicial review of the magistrate [judge's] decision").

The Clerk is directed to send copies of this Order to the parties either electronically through the Electronic Case Filing (ECF) system or by mail.

**SO ORDERED.**

Dated: Brooklyn, New York
       April 6, 2021

                                   /s/ Cheryl L. Pollak
                                   Cheryl L. Pollak
                                   Chief United States Magistrate Judge
                                   Eastern District of New York

24